Note.—See 36 Cyc. p. 689; anno. 49 L. R. A. 507; 25 R. C. L. p. 338; 4 R. C. L. Supp. p. 1582.

---

## SUMMERS v. WILLIAMS et al.

No. 17458. Opinion Filed Nov. 8, 1927.

(Syllabus.)

1. **Appeal and Error—Discretion of Court in Denying Motion for New Trial for Newly Discovered Evidence.**

A motion for a new trial on the ground of newly discovered evidence is addressed to the sound discretion of the trial court, and where the record does not show that the trial court has abused such discretion, the court's action in denying such motion for new trial will not be reversed by this court.

2. **New Trial—Newly Discovered Evidence —Essential Showing.**

The rule is generally well recognized that. in order to grant a new trial upon the sole ground of newly discovered evidence, such evidence must meet the following requirements: (1) It must be such as will probably change the result if a new trial be granted; (2) it must have been discovered since the trial; (3) it must be such as could not have been discovered before the trial by the exercise of due diligence; (4) it must be material to the issue; (5) it must not be merely cumulative to the former evidence; (6) it must not be to merely impeach or contradict the former evidence.

3. **Same—Denial of Motion Sustained.**

Evidence examined, and it is held, that the trial court did not abuse its discretion in refusing to sustain plaintiff's motion for new trial.

Commissioners' Opinion, Division No. 1.

Error from District Court, Muskogee County; O. H. Searcy, Judge.

Action by Will Summers against Sam Williams and wife. Judgment for defendants, and plaintiff appeals. Affirmed.

Glenn Alcorn, for plaintiff in error.

Disney & Wheeler, for defendants in error.

BENNETT, C. A civil action tried in the district court of Muskogee county. From judgment for the defendants on cross-petition, the plaintiff brings the case here for review. The parties will be referred to as plaintiff and defendants as they were designated in the court below.

Plaintiff's petition alleged that defendant Sam Williams and his wife, Cora, the latter now deceased, executed and delivered to plaintiff their promissory note under date of January 4, 1919, for the principal sum of $500 due and payable October 1, 1919, and at the same time the same parties executed and delivered to plaintiff a mortgage covering property located in the town of Haskell, Muskogee county, Okla., as security for the payment of said note; that the terms and conditions of said note and mortgage have been broken in that the note and mortgage are long since past due. Plaintiff demands judgment on the note and for foreclosure of the mortgage.

The defendants in due time filed their answer and cross-petition denying the material allegations of the petition, admitting the execution of the note and mortgage described in plaintiff's petition, but alleging that the same has been paid in full.

The cross-petition alleged that on January 17, 1920, Sam Williams and his wife executed and delivered to plaintiff their promissory note in the sum of $800, which was partly secured by a mortgage executed and delivered by said defendants to plaintiff, and covering certain personal property and a certain cotton crop for the year 1920, and that Sam Williams was indebted to plaintiff on January 17, 1920, in the sum of $1,300; that in the fall of that year, at the plaintiff's demand they turned over to said plaintiff their entire cotton crop, which was ginned and baled, and that the plaintiff agreed with defendants to accept and purchase said cotton at the market price during the month of October of that year; that the cotton was of high grade, and that the reasonable market value thereof was $2,-000; that thereafter defendants demanded a settlement of plaintiff and the surrender and cancellation of their notes, together with the difference then owing them arising from the sale of said cotton; that plaintiff finally delivered to defendants the note for $800,. but that the plaintiff refused to account to them for the difference between said notes and the value of said cotton, and they allege that the plaintiff is justly indebted to them in the sum of $700, the difference between said notes and the value of said cotton. They ask judgment therefor, together with interest from October 1, 1920.

Plaintiff files his reply admitting the execution of the $800 note referred to in defendants' answer, and that the said defendants delivered to plaintiff their cotton crop for the year 1920, amounting to 8,637 pounds of lint cotton, but denies that the plaintiff agreed to purchase the same at the October, 1920, market price, or at any other stipulated price, but alleges that it was agreed between said plaintiff and said defendants that the cotton should remain in the possession of the plaintiff until such time as they together should agree upon the sale of the same; that the plaintiff was entitled to one-fourth and said defendants to three-fourths interest in the cotton, and that in March, 1921, plaintiff purchased from said defendants their interest in said cotton at an agreed price of 8 cents per pound, amounting to $518.22, and that he advanced to defendants various sums of money aggregating $537.25, and a further sum of $38.64 cash rent for corn land in 1920.

Plaintiff further avers that one A. Beshara, a merchant of Haskell, Okla., held a second mortgage on said cotton crop given him by said Sam Williams and wife to secure a promissory note due in the fall of 1920, and that after the purchase by plaintiff of defendants' interest in the cotton, Beshara sued upon said promissory note and for foreclosure of his second mortgage; and that the plaintiff was compelled to and did pay in settlement of a judgment therein secured the sum of $175, for which plaintiff demands judgment against said defendants. Further replying plaintiff says that there is a balance of $378.70 on the $500 note referred to above.

Plaintiff admits that the defendant Sam Williams executed to him his promissory note in the sum of $800 on January 17, 1920, and that the same was secured by a mortgage on crop, span of mules, horse and buggy; admits that the defendants paid plaintiff the proceeds from sale of mules, $500, and from horse, buggy and harness, $250, and. $27.50 in cash in March, 1925, and prior to the purchase of said cotton by plaintiff from said defendants. Wherefore, plaintiff demands judgment for $443.05 due on account and interest, and a judgment and decree of foreclosure of the mortgage sued on, a balance of $379.20.

The following reflects the testimony: Plaintiff testified, in substance, that said defendants delivered to him the $500 note January 4, 1919, due October 1, 1919; that the $266 had been paid thereon leaving a balance of $234 secured by mortgage on lots in the town of Haskell; that, subsequently, the defendants gave plaintiff his second note for $800, which was not connected in any way with the $500 note, but was for corn and supplies in 1920; that the $800 note was paid; that defendants paid plaintiff by wagon and team $500, horse and buggy $250, and 16 bales of cotton at 8 cents per pound; that in the fall of 1920 the price of cotton was declining; that the defendants did not know whether to sell or not; that defendants wished to leave the cotton at the gin, but finally brought it to plaintiff's yard; plaintiff promised to become responsible for it; that when cotton was first picked it was worth from 25 to 30 cents per pound, but kept going down until it got as low as 7 cents per pound, at which time plaintiff offered and defendant accepted 8 cents per pound for the cotton; that the defendants at that time were thinking of going to Texas and were considerably indebted to plaintiff, who was willing to take a chance on buying the cotton at eight cents; plaintiff's books of account are introduced showing the various transactions between plaintiff and defendants. Plaintiff, on cross-examination, said that he furnished the defendants $1,478.02 altogether, and that

he purchased the cotton from defendants in March, 1921, getting 16 bales, one-fourth of which belonged to plaintiff as his rent.

W. N. Cantaberry, a cotton buyer, knew the market price of cotton in the fall of 1920; that in September cotton was worth $27.65 per 100, about October 1, 21 cents, October 25, 20 cents, and that the price kept going down until it reached ten and then eight cents per pound; that cotton was late in picking that year, and was gathered along in January, February, and March, 1921. W. S. McCoy was present when defendant went to plaintiff and sold him the cotton. Did not remember the price as he was not interested. Miss Beasley: In the fall of 1920-21 was working for Beshara, Brothers, and that defendant Williams told her in March that he had sold his cotton to plaintiff and was going to Mexico.

Defendant in his own behalf testified, in substance, as follows: That he executed the $500 note, but that the same had been paid off in the fall of 1919, at the Haskell National Bank. Defendant hauled cotton and applied the proceeds of same to the payment of said note until the same was fully discharged; made payments on the note when Mr. Night was there; when the note was paid witness demanded the surrender of the note. The note was at the bank and witness and plaintiff went to get the note. Plaintiff told Mr. Night that the defendant Williams had paid off the note and was calling for it. Mr. Night said he wanted the note to remain there until he paid it off to the bank. Witness made nine bales and a fraction of cotton that year. The $800 note witness made to plaintiff was subject to a $200 credit represented by a receipt which is produced and introduced in evidence. All told, witness owed the plaintiff $1,132 before anything was deducted. There should be deducted from this sum $200 overcharge, as shown by receipt of witness, and also $750 for wagon, team, and buggy and horse, and the further sum of $25.50 represented by receipt for cash. Witness began to gather his crop of 1920 along about the 15th of September, and had all of the cotton picked, ginned and baled in November. The plaintiff told witness to carry it over to the plaintiff's home and leave it; that he had made arrangements for it over there. Witness told plaintiff he could not afford to hold the cotton at the price, and that he wanted to sell. and that the plaintiff told him that he would hold it and would guarantee witness the price. That was in November. Plaintiff made witness hold the cotton; would not

consent to sell. Witness delivered all of the cotton to the plaintiff who said he would be responsible for it and guarantee witness that he would get more for it and would guarantee the price would be 16 cents. That was in November.

Mr. Bates, a cotton buyer at Haskell, offered to purchase the cotton at 16 cents, and witness made this offer known to the plaintiff. Witness showed the written offer of Mr. Bates of 16 cents for the cotton to plaintiff, and he agreed to guarantee witness the same price. Witness went to town after getting the offer from Bates, and met the plaintiff and asked him what about the price Mr. Bates had made him; that Mr. Bates had said to witness to come back and see him again, and the plaintiff said "I will guarantee you 20 or 22 cents for the cotton," and witness said he was able to hold it only a few days, and that the plaintiff could take it at the price. Said he did not have the money then, but that he would guarantee 22 cents, and that the witness would get even more than that for it: that later witness sent several buyers who wished to buy the cotton, but the plaintiff would not even let them sample it; would not let them go inside the yard for that purpose. All the cotton was held together. The cotton remained in the plaintiff's yard; witness could not get loose from it; sold the cotton in a way.

Cross-examination: Witness had all of his cotton out and hauled to the gin in November. Does not remember picking any of it in January. Had 17 bales out in November. Was not picking after that. Witness could not sell the cotton at all. Plaintiff had it in his yard and would not let the buyers sample it. Witness does not know about the price in the spring. Tried to sell the cotton in the fall at 16 cents, but plaintiff said not.

W. M. Shaw lives at Haskell; knows Mr. Bates and Mr. Combs; was present when Bates was trying to buy Sam's cotton. This was about the 15th or 20th of November. Bates said he would give Sam 16 cents, and Sam Williams stated that if he could do no better he would come back and sell it to him.

"Q. What happened? A. Bates said, 'I will give you sixteen cents,' and Sam said, 'If I can't do no better I come back and sell it to you, if I can't get Summers to price it.' Q. What did he do? A. Said he would take it. Q. That was between the 15th and 25th of November? A. Yes, sir."

There is much other testimony of a cor-

roborative nature, and none of it very clear, but upon a consideration thereof the court found in favor of the defendant on plaintiff's petition, and also on the defendant's cross-petition, and rendered judgment thereon in favor of the defendants and against the plaintiff for the sum of $861.83, less the sum of $175, because of the payment by said plaintiff of a judgment against said defendants in the cause of A. Beshara v. Sam Williams. The court further found that the mortgage given by Sam Williams on January 4, 1919, to Will Summers should be canceled, set aside, and held for naught. Plaintiff's motion for new trial was predicated upon newly discovered evidence, and while the brief of plaintiff in error assigns eight grounds of error, his argument is confined to a consideration of one proposition: That the trial court erred in overruling the motion of plaintiff for new trial on the ground of newly discovered evidence, and we shall confine ourselves, therefore, to a consideration of this one assignment of error.

It will be noted, first, that in this case each of the parties waived a jury and tried the issues before the court. The newly discovered evidence appears in the following affidavits, the substance of which will be given: W. S. Grimmett says that he has known plaintiff and defendant seven or eight years; that he frequently saw Sam Williams at the store of Beshara Brothers at Haskell in the years 1920 and 1921, and that he heard Williams speak of holding his 1920 cotton crop for better prices; that in the spring of 1921, the defendant stated to him and others that he had sold his cotton to Will Summers for eight cents, and that Williams refused to turn over to Beshara the lots covered by the mortgage, and gave as his reason that the plaintiff held a first mortgage on the lots and he could not, on that account, turn them over, and a few days later that Williams said he still owed Summers. Affiant further says that in some of his conversations defendant said that he was satisfied with the price of eight cents for his cotton.

D. B. Bates says that he is a colored man with family, well acquainted with Sam Williams; has known him since 1918: that affiant and Sam Williams lived on Jack Summers' place two miles south of Haskell in 1920; that the price of cotton in the fall of 1920 declined so rapidly after picking commenced that many farmers held their cotton until spring and some of them for a year; that affiant and Sam Williams held their crop of cotton until the spring of 1921;

that they talked the matter over many times in the fall and winter of 1920, and agreed that the price would advance after the bulk of the crop was marketed; that affiant picked cotton until the latter part of March, 1921.

H. F. Sisco says that he is 52 years old and lives on the Summers farm; that the house he lives in was about 300 yards from the house occupied by Sam Williams; that he picked his own cotton until the 20th of December, 1920, when the price fell so low that he could not afford to pick it for his one-half, and that he and his family abandoned his crop leaving about 3½ bales unpicked, and that he and his family picked cotton for Sam Williams a few days before Christmas, and for several weeks thereafter; does not know when they quit picking, and that Williams stated to him that he was holding his cotton for a better price.

It is to be noted, first, that the defendants in their cross-petition alleged that the plaintiff agreed with the said defendants to accept said cotton and purchase the came at the market price of the same during the month of October, 1920. It should have been perfectly clear to the parties that the vital issue in the case was whether or not the plaintiff had agreed with the defendants to purchase or take over their cotton, either at a fixed price or upon terms which might be made certain. The plaintiff necessarily should have been expected to know that the defendants would testify in substance in conformity with their allegation, and they did testify to a state of facts not exactly in accord with their allegations, but so nearly in accord therewith that even the plaintiff made no objection thereto either during the trial or thereafter, that is, he made no contention at any time that the testimony was incompetent or irrelevant or objection in any way on the ground that the same did not tend to prove any issue raised by the pleadings or otherwise. There was no contention that there was a departure or a variance, nor was it contended that the evidence was insufficient upon any ground. The fact is, we believe, the record does not contain a single exception reserved by either party, and the sole question therefore is whether or not a new trial should be granted on the ground of newly discovered evidence. At the trial the witness McCoy testified that he was present when defendant sold his cotton to Summers and they agreed on the price. Miss Beasley testified that the defendant told her that he had sold plaintiff his crop. Witness Night said he understood that defendant had sold

plaintiff his crop. It appears, further, that all these "new" witnesses lived in the neighborhood and they could have been easily reached.

In the case of Bank of Chelsea v. School Dist. No. 1, 62 Okla. 185, 162 Pac. 809, the court held:

"A party will not be entitled to a new trial upon the ground of newly discovered evidence, where he knew of the absence of the evidence at the time of going to trial, unless it appears that such party took proper legal steps to procure a continuance or delay of the trial on account of the absence of the evidence."

In the case of First Nat. Bank of Taloga v. Farmers Bank, 62 Okla. 30, 161 Pac. 1063, it is said:

"As we view it, the existence of the evidence itself, as distinguished from the whereabouts of the witness, must have been discovered since the trial in order to authorize a new trial."

In McCants v. Thompson, 27 Okla. 706, 115 Pac. 600, the court says:

"The facts set out in the affidavits in support of the motion for a new trial appear to have been known to the defendant at the time of the trial. **If he was surprised, he should have asked for a continuance or delay of the case, in order to properly make his defense.** We cannot say that the trial court erred in refusing to grant a new trial on account of surprise or newly discovered evidence."

To the same effect are the following cases: Salt Lake Inv. Co. v. Stoutt (Utah) 180 Pac. 182; Manufacturers' Finance Co. v. Sherman, 99 Okla. 295, 227 Pac. 451; Wilson v. State, 73 Okla. 227, 175 Pac. 829; Vickers v. Philip Carey Co., 49 Okla. 231, 151 Pac. 1023; Ellis v. Mid-Continent Oil & Gas Co., 65 Okla. 124, 165 Pac. 177.

So far as we can discover, there is no evidence in this case of any diligence to procure the presence of these witnesses at the trial. It would occur to an ordinarily diligent litigant, if not to his attorney, to ascertain what the neighbors of this defendant knew about the sale of his cotton if they were put on notice in a lawsuit that he was going to claim, and the plaintiff were going to deny, a purchase of the cotton, either at the market price or at a figure certain. Moreover, the trial court, if informed during the trial that a witness a few miles away would testify to that which would destroy a party's right of action, would be inclined to give an opportunity for the securing of the presence of that witness. The plaintiff seemed to be satisfied

with his proof, he evinced neither surprise nor disappointment at the testimony of the defendants, for, in the light of defendants' pleading there could have been no surprise at the substance of their testimony.

Examining the "newly discovered evidence," what is the nature and purpose of it? Seemingly, it is largely to impeach the defendants. Such testimony is generally held not to be of the kind which will warrant a new trial. Upon its face it is neither definite nor certain with respect to the time nor circumstance. It is true that Grimmett's affidavit, if taken as true, would seem to indicate that defendant had sold his crop to the plaintiff for eight cents.

In the case of Vickers v. Philip Carey Co., supra, the court says:

"Where the ground of the petition is newly discovered evidence, such applications are, as a general rule, viewed with disfavor by the courts. The law authorizing the granting of new trials upon the ground of newly discovered evidence, does not contemplate that such new trials shall be granted where the newly discovered evidence is merely cumulative. 'Cumulative evidence', in the law governing the granting of new trials, is additional evidence of the same kind, and to the same point as that given on the first trial, but it is not cumulative if it relates to distinct and independent facts of a different character, though tending to establish the same ground of claim or defense. A rule of wide recognition regarding the granting of new trials on the ground of 'newly discovered evidence' exacts that the evidence fulfill the following requirements: (1) It must be such as will probably change the result if a new trial be granted; (2) it must have been discovered since the trial; (3) it must be such as could not have been discovered before the trial by the exercise of due diligence: (4) it must be material to the issue; (5) it must not be merely cumulative to the former evidence; (6) it must not be merely impeach or contradict the former evidence.

"Where the newly discovered evidence tends only to strengthen other evidence of the same kind to the same point, * * * and is not such as would probably change the result if a new trial were granted, it is error, calling for a reversal, for the trial court to set aside the verdict of the jury and grant the moving party a new trial."

"Motions for a new trial upon the extraordinary ground of newly discovered evidence are not favored. If not regarded with suspicion, they should at least be granted with great caution. They should only be granted to avoid palpable injustice, and in order that the judgment set aside may perhaps be replaced by a different finding. * * *

"A party is entitled to have his day in court; both parties are entitled to this, but neither party is entitled to have more than one fair, reasonable opportunity to establish his claim or defense. To allow more would be to protract litigation to the extent which would preclude the administration of justice." Hobbs v. Smith, 27 Okla. 830, 115 Pac. 347.

"A motion for new trial on the ground of newly discovered evidence is addressed to the sound discretion of the trial court, and where the record does not show an abuse of such discretion, the court's action on such motion will not be disturbed by the Supreme Court." Danciger v. Isaacs, 82 Okla. 263, 200 Pac. 164.

There was testimony in the case given by W. S. McCoy and Miss Beasley which would indicate that they had had conversations with the defendant, in which he indicated that it appears that both sides proved that a he had sold his cotton to the plaintiff, but the exact price was not named. From this sale had been made; the difference being the price at which the sale was consummated, the defendant claiming that he had sold and was to be paid from 16 to 22 cents, the market price in October. The other testimony being that he sold for eight cents. This issue was for the determination of the trial court. It had the witnesses before it. It could observe them and we cannot. As is said in one of our cases in substance, the manner of a witness is sometimes more indicative of the truth of his statement than his exact words.

Upon an examination of this entire record, we conclude, first, that there was not much diligence shown to procure the testimony which is now described as newly discovered testimony; second, the testimony is largely cumulative; and third, also largely impeaching.

20 R. C. L. page 289, par. 72, uses this language:

"While newly discovered evidence, material to the party applying, which he could not with reasonable diligence have discovered and produced at the trial, is ground for a new trial, applications on this ground are not favored by the courts, and in order to prevent, so far as possible, fraud and imposition which defeated parties may be tempted to practice as a last resort to escape the consequence of an adverse verdict, such applications should always be subjected to the closest scrutiny by the court, * * * (citing many cases, including Hobbs v. Smith, 27 Okla. 830, 115 Pac. 347, and Vickers v. Philip Carey Co., supra), and the burden is upon the applicant to rebut the presumption that the verdict is correct and that there has been a lack of due diligence. The matter is largely discretionary with the trial court, and the exercise of its discretion will not be disturbed except in case of manifest abuse." (See note 5 and cases cited.)

Upon a consideration of the entire record, we are of the opinion that the plaintiff has had a fair trial, and we are not prepared to say that the trial court abused its discretion in refusing to grant a new trial, and therefore the judgment below is in all respects affirmed.

TEEHEE, REID, LEACH, and FOSTER, Commissioners, concur.

By the Court: It is so ordered.

Note.—See under (1) 4 C. J. p. 835, §2817; 29 Cyc. p. 1009. (2) 29 Cyc. pp. 883, 886, 899, 901, 911, 918. (3) 4 C. J. p. 835, §2817. See under (1,2) 20 R. C. L. p. 290; 3 R. C. L. Supp. p. 1051; 4 R. C. L. Supp. p. 1351; 5 R. C. L. Supp. p. 1096; 6 R. C. L. Supp. p. 1202.